UNITED STATES DISTRICT COURT
MIDDLE DISTRICT OF TENNESSEE
NASHVILLE DIVISION

| | |
|---|---|
| EMILY NESBITT, ALICE STANLEY, and JESSICA ADAIR, | ) ) ) |
| Plaintiffs, | ) ) |
| v. | ) No. 3:11-cv-0574 ) ) |
| WILKINS TIPTON, P.A., | ) Judge Sharp ) Magistrate Judge Knowles ) |
| Defendant. | ) |

## MEMORANDUM

Defendant Wilkins Tipton, P.A. filed a Motion for Summary Judgment (Docket Entry No. 47), to which Plaintiffs Emily Nesbitt, Alice Stanley, and Jessica Adair (collectively the "Plaintiffs") filed a response in opposition (Docket Entry No. 55), and Defendant filed a reply (Docket Entry No. 57).

## I. FACTUAL BACKGROUND

Defendant Wilkins Tipton, P.A. ("Wilkins Tipton") is a law firm with offices in Greenville and Jackson, Mississippi; Mobile, Alabama; Charlotte, North Carolina; and Brentwood, Tennessee.[1] In 2010 and 2011, the Brentwood office of Wilkins Tipton was staffed by Attorneys Jay McLemore ("McLemore")[2] and David Eaton ("Eaton"), who were responsible for the general conduct and operation of the office.

---

[1] Unless otherwise noted, the facts are drawn from *Defendant's Statements of Material Facts not in Dispute* and Plaintiffs' responses thereto (Docket Entry Nos. 48 and 56) as well as related exhibits. Plaintiffs have failed to provide a "concise statement of [] additional facts" as required by Local Rule 56.01(b). *See* LR 56.01. In any event, and based upon the record, the specific facts set forth in this Court's summary appear to be a fair characterization of the facts relevant to the issues presented in the filings.

[2] McLemore is no longer employed with Wilkins Tipton.

1

Plaintiffs, all Caucasian females, were employed at the Brentwood location of Wilkins Tipton at all times relevant to this lawsuit.  Plaintiff Emily Nesbitt ("Nesbitt"), who was assigned to work with McLemore, was a Paralegal from December 1, 2010, until she left for maternity leave on July 22, 2011.  She accepted a higher paying position with Coventry Health Care in or around September 2011.[3]  Plaintiff Alice Stanley ("Stanley") was hired in August 2010, and is presently employed with the company. She is a Receptionist/Secretary/Office Manager.  Plaintiff Jessica Adair ("Adair"), who was hired on August 23, 2010, is currently employed as a Paralegal assigned to work with Eaton.

Plaintiffs allege McLemore's commentaries and other conduct created a hostile work environment in the Brentwood office.  McLemore is accused of grabbing or touching his penis through his pants on a number of occasions, making racial and homosexual comments and doing impressions, bumping into or brushing up against Plaintiffs, and making comments that were sexual innuendos.

According to Nesbitt, McLemore first began "grabbing himself" in December 2010, which she occasionally would see, but would "brush [] off."  She began to think that it was deliberate when it happened in front of her, and the last time it occurred was in April 2011. McLemore would touch himself for approximately three to four seconds, and she saw McLemore "grab himself" about 20 times.  McLemore rubbed or brushed himself against her backside on approximately 7 occasions, and the first occurrence was in January 2011.

Stanley contends that there was "extreme fondling of himself on an almost daily basis" and that it went beyond "readjusting" himself. (Stanley Dep. at p. 82). McLemore stood in front of her desk "flipping himself around and playing with himself for two or three minutes at a time,

---

[3] Subsequent to the alleged harassing conduct by McLemore, Nesbitt began to search for employment.  The "purpose was not to make more money but to leave Wilkins Tipton as soon as possible."  (Docket Entry No. 55-2, Nesbitt Aff. at ¶ 5).

2

Case 3:11-cv-00574   Document 85   Filed 08/16/12   Page 2 of 20 PageID #: 1273

[while] having a conversation with [her]." (*Id.*). When asked how many times this occurred, shre testified "it's really hard to even put a fifty on it." (*Id.* at 89). When McLemore "grabbed" himself, he would not use sexual language, but would engage in normal conversation about a case or what happened that day. During McLemore's tenure at Wilkins Tipton, McLemore brushed or rubbed up against her maybe 8 times. The last time it occurred was in April 2011. Stanley testified that the "worst ones" took place in January and February 2011.

Adair testified that when McLemore stood for an extended period of time talking, "he open[ed] his legs and move[d] around his penis with his hand on the outside of his pants, similar to what you would see if you were watching a baseball game." (Docket Entry No. 48-6, Adair Dep. at p. 39). More specifically, Adair testified that he would "mainly pick up the member and move it from side to side, flop it from side to side." (*Id.* at p. 101). From August to December 2010, she probably saw McLemore do what is described above at least 15 times, but less than 20 - and it would last between 5 and 15 seconds. McLemore brushed up against her from behind approximately three times, and the last time it occurred was on March 29, 2011.

While in Plaintiffs' presence, McLemore purportedly made comments that were of a sexual nature. In mid-November 2010, Adair testified that she and McLemore were discussing the interview process for a new paralegal. He stated that one candidate wore a lot of makeup, had long bleached blonde hair and gestured that she had "big boobs." Adair testified McLemore looked at her after making the above comment and asked "didn't she?" and Adair stated, "yeah, she was over the top and I think she had had some work done." On December 6, 2010, McLemore ordered lunch for the office staff and Adair said, "why don't we play Christmas music?" McLemore asked for the television controller and turned the channel to a pay per view station of an erotic nature. The name of the station appeared, but no movie or movie title showed

3

on the screen.  After the incident, McLemore talked about a telephone number that he used to call in Jackson, which was similar to a 1-900/chat room number; he then tried to pick up the telephone and call it - and Adair said, "we do not need to call that number."[4]  While having lunch, McLemore stated that his wife made him go see the movie "Sex in the City 2" and that the only reason a man would see the movie is because of the babysitter with her bouncing boobs in a wet t-shirt, wherein he simulated bouncing breasts.  Adair testified that she told McLemore to stop talking about the movie; he eventually stopped talking about it.[5]

Seemingly, McLemore also made multiple comments about things sounding "dirty," indicating something was vulgar.  Adair testified that on December 9, 2010, McLemore asked what she and Eaton wanted for breakfast at the Waffle House.  Adair replied she wanted "a biscuit that has that ham that's salty and rubbery" to which McLemore said, "ooo, that sounds dirty." (Adair Dep. at p. 46).  On another occasion, in the office kitchen, Stanley was looking for jelly packets for her biscuit, and the jelly squirted out on the table/counter.  Stanley uttered, "oooo, that's [*sic*] made a mess" and McLemore responded, "oooo, jelly sticky and sweet.  That sounds dirty."  Sometime in January 2011, the office staff was going to go out for a meal.  Adair suggested they go to the "Puffy Muffin" and McLemore replied that the "puffy muffin sounded dirty."  Adair responded to McLemore that the name did not sound dirty and asked what was dirty about it.  McLemore stated that "we all know what muffin is slang for."  Adair told him that it was not funny, and he left the kitchen.  Nesbitt testified that she likewise heard the comment about the puffy muffin sounding nasty or dirty on one occasion.

---

[4]  This was witnessed by the other two Plaintiffs as well.  (Adair Dep. at p. 36; Nesbitt Dep. at p. 22; Docket Entry No. 48-5, Stanley Dep. at p. 46).

[5]  Eaton was also present when McLemore made his comments on December 6, 2010.

According to Plaintiffs, McLemore would tell inappropriate jokes of a racial nature in the workplace. One time Nesbitt was in McLemore's office, and he was talking about witnesses or examinations under oath and their apparel. He described an African-American man who was wearing a t-shirt that said, "seven inches soft," and McLemore was laughing and thought that it was funny.[6] According to Adair, McLemore said he had lived in the Nashville Area for two years and said he had to leave Jackson, Mississippi because it is "eighty percent black." Similarly, Nesbitt testified that during her second or third work day at Wilkins Tipton, during a drive downtown while discussing her time living in Detroit, McLemore made the comment that he had to leave Mississippi because it was "eighty percent black."

Moreover, Adair allegedly heard McLemore make fun of an adjuster for an insurance client, who happened to be African-American, by "mimicking ghetto talk" and doing a comedy routine like "Chris Rock might do." (Adair Dep. at 56, 58). Nesbitt testified that McLemore did an impersonation of the insurance adjuster by using "an exaggerated ghetto talk" and that she heard him do an impersonation of the adjuster maybe six times. Stanley testified that after coming back from a docket call or General Sessions trial in Shelby County, McLemore made comments about how ignorant "those people" are and proceeded into his "ghetto" terminology about how "they can't get anything straight down there, they're inept, don't even try calling them, [and] they don't file things on time." Further, Adair testified that in January 2011, McLemore reiterated a story in what she described as an "urban dialect," about an African-American woman who was very fat and working at a drug store. This lady was filling a prescription when a gnat flew by, and he was doing the gestures of trying to get it away.

---

[6] Plaintiff Stanley testified that during her initial interview, McLemore shared a story about a "client" showing up for a deposition wearing a t-shirt that said "I'm seven inches soft." (Stanley Dep. at p. 24).

5

On January 21, 2011, Nesbitt sent an email to the Wilkins Tipton Jackson office complaining about racial and "homophobic"[7] comments made by McLemore, and as a result, she received an email apology and personal apology from McLemore. G.W. Flinn ("Flinn")[8] testified that he contacted McLemore and advised him of the complaint. Flinn told him that if this had occurred, it should cease and he should apologize to Nesbitt.

On March 15, 2011, Flinn visited the Brentwood office to perform employee evaluations and while he was there, spoke with each Plaintiff and the other employees. No issues were brought forth. On March 29, 2011, Flinn received an email from Eaton informing him while things had been going smoothly in the office, Adair had advised him that McLemore brushed up against her. Later on March 29, 2011, Adair's husband came into the Brentwood office, entered McLemore's office and accused him of touching his wife, to which McLemore categorically denied.

The following day, on March 30, 2011, Flinn visited the Brentwood office again and met with the entire staff. Flinn concluded that if any touching had occurred, it was inadvertent since the office had limited space. As a result, Flinn implemented rules that no more than one employee at a time could be in the copy room and that no more than one employee could be in the break room at a time.[9] The following day, Nesbitt unhappy with the new rules, sent Flinn an

---

[7] Plaintiffs accuse McLemore of making fun of homosexuals. Adair testified that McLemore did an imitation of a "flamboyant gay person" 4 to 5 times during the time she worked at Wilkins Tipton. According to Nesbitt, she heard McLemore do an impression of a gay man, who was involved in a lawsuit he was defending, on one occasion in December 2010 or January 2011. Stanley, likewise, testified that McLemore did an imitation of gay man, who was involved in litigation that McLemore was handling, and he discussed with her the claims the man was making.

[8] Flinn was hired as the Chief Executive Officer of Wilkins Tipton in January 2009 and is based in the Jackson, Mississippi Office. Flinn's job responsibilities include investigating and addressing employee complaints. Wilkins Tipton employees are informed that any complaints or concerns can be made known to Flinn, Judy Thorpe, the Director of Office Administration, or any of the attorneys in the Office.

[9] Stanley testified that from March 30, 2011, the date of the meeting, up until the time of her deposition, that with the exception of one brushing incident at her desk, McLemore did not touch her. (Stanley Dep. at p. 125).

email, wherein she claimed for the first time that McLemore had bumped into her. Flinn responded to her email. Nesbitt, however, had already made the complaints about inappropriate comments and the simulation of bouncing breast, etc. (Nesbitt Dep. at p. 118).

It was later decided by Wilkins Tipton that security cameras would be installed in the Brentwood office to protect the firm and Wilkins Tipton employees and to clarify what was actually happening or not happening in the office. The security cameras were installed on April 29 and April 30, 2011 (Docket Entry No. 48-1, Flinn Dep. at p. 84). Wilkins Tipton installed twelve security cameras in the office, one in every room, including the attorneys' offices and kitchen.

Adair testified that McLemore fondled himself on one occasion in May 2011, but otherwise had not done or said anything else that she found offensive since March 29, 2011. (Adair Dep. at pp. 102-03, 131). Stanley testified that McLemore fondled himself once after the cameras were installed, but she could not recall the day. (Stanley Dep. at 128, 136). There was one additional "brushing incident" after the installation. (*Id.*). Stanley further testified there had not been any racial or homophobic jokes since the cameras were installed. (*Id.*). In fact, she stated "[h]e's been on his best behavior." (*Id.*).

As a direct and proximate result of the aforesaid acts, Plaintiffs purport to have suffered and continue to suffer extreme physical and emotional distress. Defendant's expert, James Walker, Ph.D, ABPP ("Dr. Walker"), performed an Independent Medical Examination ("IME") on each Plaintiff to evaluate their alleged mental injuries and conditions.

With regard to Nesbitt, he opined that she has suffered from "psychosomatic issues related to anxiety for much of her life," including stress and anxiety from having experienced two sexual assaults in 2007 and 2009 and "sexual harassment" in middle school. He stated that

7

Case 3:11-cv-00574   Document 85   Filed 08/16/12   Page 7 of 20 PageID #: 1278

as a result of the alleged incidents at issue in this lawsuit, she "experienced some mild psychological distress." (Docket Entry No. 48-8, Walker Report – Nebbitt at p. 8). According to Nesbitt, the anxiety was subsequently relieved by medication, and was relieved after stopping medication, until the incidents at Wilkins Tipton. (Docket Entry No. 55-2, Nesbitt Aff. at ¶ 6).

Moreover, Dr. Walker stated that Nesbitt is able to handle her activities of daily living, including working 40 hours per week, walking, walking her dogs, running, visiting family and friends, and scrapbooking, and he noted that she is able to drive and manage finances. Dr. Walker stated in his Report about Nesbitt:

> Despite her history of anxiety and mood issues, she has excelled in her occupational life, and is currently in a very responsible position performing very complex and responsible tasks. She is sustaining a relationship, raising her child, and managing her day-to-day life without difficulty. There is no evidence of any significant limitation in her daily functional activities.

(Walker Report – Nesbitt at p. 8).

As to Stanley, Dr. Walker opined that "[d]espite her history of anxiety and mood issues, she has continued to function effectively as a mother, daughter, friend, and successful employee without undue problems or interruptions. There is no evidence of any significant limitations in her daily functional abilities." (Walker Report – Stanley at p.10). Stanley, in contrast, purports "she was not functioning effectively as a mother nor a friend… she used to be social, but ever since the incidents happened, she cannot bring herself to leave the house and if her friends want to see her, they come to her house." *See* (Docket Entry No. 55-1, Stanley Aff. at ¶ 7).

Furthermore, Dr. Walker indicated that Plaintiff Stanley has a "negative hindsight bias" and "she attributes most of her problems and difficulties to that set of unpleasant experiences, rather than recognizing her own issues and other contributions to her distress." (Walker Report – Stanley at p.10).

8

Dr. Walker also performed an IME on Adair, wherein he discoursed that:

> Despite her history of anxiety and mood issues, she has excelled in her occupational life, and is currently in a very responsible position performing very responsible tasks. She is sustaining a relationship, maintaining a household, raising her children, and managing her day-to-day life without undue difficulty, according to her report. There is no evidence of any significant limitation in her daily functional activities.

(Walker Report – Adair at p. 9). Furthermore, Dr. Walker indicated that Adair has been taking Ambien for sleep problems since August 2010 and opined that Adair has sustained "mild psychological distress" as a result of the workplace events. Adair's husband, Shayne Adair, testified that she is "much better" now and that he does not know if she takes any medication for anxiety or difficulty sleeping.

With regard to their job performances, Nesbitt testified that she received a good performance review and that she has not received any formal disciplinary action. Stanley testified that she did not generally miss work, is able to perform well her job duties that she is assigned, she has received good performance reviews, and received a raise. Adair testified that she has received no discipline at Wilkins Tipton, she has done a great job there, and has received a raise. She further testified that she has always been able to do her job and enjoys working with Eaton.

## II. STANDARD OF REVIEW

A party may obtain summary judgment if the evidence establishes there are not any genuine issues of material fact for trial and the moving party is entitled to judgment as a matter of law. *See* Fed. R. Civ. P. 56(c); *Covington v. Knox County School Sys.*, 205 F.3d 912, 914 (6th Cir. 2000). The moving party bears the initial burden of satisfying the court that the standards of Rule 56 have been met. *See Martin v. Kelley*, 803 F.2d 236, 239 n.4 (6th Cir. 1986). The ultimate question to be addressed is whether there exists any genuine issue of material fact that is

disputed.  *See Anderson v. Liberty Lobby*, 477 U.S. 242, 248 (1986); *Covington*, 205 F.3d at 914 (citing *Celotex Corp. v. Catrett*, 477 U.S. 317, 325 (1986)).  If so, summary judgment is inappropriate.

To defeat a properly supported motion for summary judgment, the nonmoving party must set forth specific facts showing that there is a genuine issue of material fact for trial.  If the party does not so respond, summary judgment will be entered if appropriate.  Fed. R. Civ. P. 56(e).  The nonmoving party's burden of providing specific facts demonstrating that there remains a genuine issue of material fact for trial is triggered once the moving party shows an absence of evidence to support the nonmoving party's case.  *Celotex*, 477 U.S. at 325.  A genuine issue exists "if the evidence is such that a reasonable jury could return a verdict for the nonmoving party."  *Anderson*, 477 U.S. at 248.  In ruling on a motion for summary judgment, the Court must construe the evidence in the light most favorable to the nonmoving party, drawing all justifiable inferences in its favor.  *See Matsushita Elec. Indus. Co. v. Zenith Radio Corp.*, 475 U.S. 574, 587 (1986).

### III. ANALYSIS

Plaintiffs have brought claims pursuant to Title VII of the Civil Rights Act of 1964, as amended, 42 U.S.C. § 2000(e) *et seq.*("Title VII"), and the Tennessee Human Rights Act, T.C.A. § 4-21-101 *et seq.* ("THRA") for hostile work environment, based on sexual and racial harassment, and retaliation.  Plaintiffs have brought an additional claim under Tennessee common law for intentional infliction of emotional distress.  Defendant has moved for summary judgment on all claims.

10

### A. Hostile Work Environment

Plaintiffs allege they were subjected to a racially and sexually harassing work environment during their employment with Defendant in violation of Title VII and THRA. Claims of harassment filed under THRA, are analyzed under the same standards as Plaintiffs' Title VII claims. *Jackson v. Canes Corp.*, 191 F.3d 647, 658 (6th Cir. 1999); *Parker v. Warren County Util. Dist.*, 2 S.W.3d 170, 172 (Tenn. 1999).

To establish a *prima facie* case of hostile work environment as to race or sex, an employee must show that: (1) she was a member of a protected class; (2) she was subjected to unwelcomed harassment; (3) the harassment was based on sex or race; (4) the harassment created a hostile work environment; and (5) employer liability. *Ladd v. Grand Trunk Western R.R., Inc.*, 552 F. 3d 495, 500 (6th Cir. 2009) (quoting *Williams v. General Motors Corp.,* 187 F.3d 553, 561 (6th Cir. 1999)). Title VII is not "a general civility code," and the conduct alleged must be so "objectively offensive as to alter the conditions of the victim's employment." *Oncale v. Sundowner Offshore Servs.*, 523 U.S. 75, 80-81 (1998).

*Racial Harassment*

Plaintiffs contend that McLemore made numerous racially derogatory and demeaning statements from December 2010 through January 2011.[10] Some of these were as follows:

(1) While talking about witnesses or examinations under oath and what people wear to them, McLemore described a black man who was wearing a t-shirt that said, "seven inches soft";

(2) McLemore said he had lived in the Nashville Area for two years and said he had to leave Jackson, Mississippi, because it is "eighty percent black";

---

[10] Plaintiffs also contend that derogatory homosexual comments were made by McLemore. In their response to the motion for summary judgment, they concede that homosexual comments are "not a prohibitive basis for discriminatory acts under Title VII." (Docket Entry No. 55 at 24).

11

(3) On one occasion, McLemore made fun of an adjuster for an insurance client, who happened to be African-American, by imitating him and doing a comedy routine like Chris Rock;

(4) After returning from a docket call or General Sessions trial in Shelby County, McLemore made comments about how ignorant "those people" were. He went into his "ghetto" terminology about how "they can't get anything straight down there, they're inept, don't even try calling them, [and] they don't file things on time"; and

(5) McLemore reiterated a story in what Adair described as an "urban dialect," about an African-American woman, who was very fat and working at a drug store. She was filling a prescription while a gnat was flying by - and he was doing the gestures of trying to get it away.

A plaintiff, though not within a protected class (as in this case), may satisfy the first prong of an asserted racial harassment *prima facie* case based on her association with or advocacy on behalf of protected employees. *Barrett v. Whirlpool Corp.*, 556 F.3d 502, 514 (6th Cir. 2009). Plaintiffs, all Caucasian females, have not provided sufficient evidence to satisfy this prong. Therefore, the Court need not analyze the remaining elements of the *prima facie* case.

Furthermore, taken together, this evidence is not enough to support a *prima facie* claim for racial harassment. The handful of isolated statements by McLemore, while offensive, is plainly insufficient to create a hostile work environment. These incidents "amount[ ] to 'mere offensive utterances,' which are not actionable under Title VII." *Clay v. United Parcel Service, Inc.,* 501 F.3d 695, 708 (6th Cir. 2007) (finding that 15 specific instances of harassment over the course of two years were not "pervasive"); *see also Morris v. Oldham County Fiscal Court,* 201 F.3d 784, 790 (6th Cir. 2000) (stating that "simple teasing, offhand comments, and isolated incidents" do not create a hostile environment); *Smith v. Fairview Ridges Hosp.,* 625 F.3d 1076, 1086 (8th Cir. 2010) (finding that sporadic racist comments, including incidents regarding fried chicken and Buckwheat, were insufficient to show a hostile work environment).

Defendant's motion for summary judgment will be granted as to Plaintiffs' claim of a racially hostile work environment.

*Sexual Harassment*

Plaintiffs contend that the actions of McLemore were likewise based on sex and were meant to target Plaintiffs "*because of their sex*." (Docket Entry No. 55 at 19). According to Plaintiffs, "[n]o well-informed disinterested third party could remotely argue that these actions were no sexual actions." (*Id.* at 20).

Defendant, nevertheless, argues that "Plaintiff[s] [have] no evidence to show that McLemore targeted [them] for harassment because of their sex." (Docket Entry No. 49 at 5). Plaintiffs' allegations, if true, Defendant contends, "do not rise to the level of actionable hostile environment sexual harassment under Title VII." (*Id.* at 6).

"[H]ostile-work-environment claims 'involve [ ] repeated conduct' and require the plaintiff to demonstrate that 'the workplace is permeated with discriminatory intimidation, ridicule, and insult that is sufficiently severe and pervasive to alter the conditions of the victim's employment and create an abusive working environment.' " *Hunter v. Sec'y of U.S. Army*, 565 F.3d 986, 994 (6th Cir. 2009) (quoting *Nat'l R.R. Passenger Corp. v. Morgan*, 536 U.S. 101, 115–16, 122 S.Ct. 2061, 153 L.Ed.2d 106 (2002)). "Both an objective and a subjective test must be met: the conduct must be severe or pervasive enough to create an environment that a reasonable person would find hostile or abusive and the victim must subjectively regard that environment as abusive." *Bowman v. Shawnee State Univ.*, 220 F.3d 456, 463 (6th Cir. 2000) (citation omitted); *see also Thornton v. Fed. Express Corp.*, 530 F.3d 451, 455 (6th Cir. 2008). "Appropriate factors for the court to consider when determining whether conduct is severe or pervasive enough to constitute a hostile work environment 'include the frequency of the

13

discriminatory conduct; its severity; whether it is physically threatening or humiliating, or a mere offensive utterance; and whether it unreasonably interferes with an employee's work performance.'" *Bourini v. Bridgestone/Firestone N. Am. Tire, LLC*, 136 Fed.Appx. 747, 751 (6th Cir. 2005) (quoting *Bowman*, 220 F.3d at 463). "The Supreme Court has consistently held that 'simple teasing, offhand comments, and isolated incidents (unless extremely serious) will not amount to discriminatory changes in the terms and conditions of employment.'" *Id.* (quoting *Newman v. Fed. Express Corp.*, 266 F.3d 401, 405 (6th Cir. 2001)).

Based on the specific facts presented in this case, the Court finds that Plaintiffs satisfy the first four prongs in their *prima facie* case.

As to the fifth prong, under the Supreme Court's decisions in *Faragher v. City of Boca Raton*, 524 U.S. 775, 807 (1998) and *Burlington Industries Inc. v. Ellerth*, 524 U.S. 742, 765 (1998),[11] liability may be imposed on an employer where a supervisor engages in workplace harassment that leads to a tangible employment action, or where the employer fails to exercise reasonable care to prevent and correct known harassment by a co-worker.[12] This is an affirmative defense, which is recognized when the employer "establishes . . . by a preponderance of the evidence . . . (a) that [they] exercised reasonable care to prevent and correct promptly any sexually harassing behavior; and (b) that the plaintiff unreasonably failed to take advantage of any preventive or corrective opportunities provided by the employer or to avoid harm otherwise." *Thornton v. Fed. Express Corp.*, 530 F.3d 451, 456 (6th Cir. 2008).

---

[11] The Tennessee Supreme Court has specifically held that the *Faragher*/*Ellerth* defense applies to sexual harassment claims under the THRA. *Parker v. Warren County Util. Dist.*, 2 S.W.3d 170, 176 (Tenn. 1999).

[12] According to Plaintiffs, "[s]ince the legal conduct began in December 2010 and continued until his leaving the firm in November 2011, the defendant could be liable under both… liability of the supervisor and liability of a coworker." (Docket Entry No. 55 at 25). Ultimately, in this instance, it does not affect the Court's analysis.

"Generally, an employer satisfies the first part of the *Faragher/Ellerth* two-part standard when it has promulgated and enforced a sexual harassment policy." *Gallagher v. C.H. Robinson Worldwide, Inc.*, 567 F.3d 263, 275 (6th Cir. 2009). "'[A]n effective harassment policy should at least: (1) require supervisors to report incidents of sexual harassment; (2) permit both informal and formal complaints of harassment to be made; (3) provide a mechanism for bypassing a harassing supervisor when making a complaint; and (4) provide for training regarding the policy.'" *Id*.

Defendant has not raised an affirmative defense under *Faragher/Ellerth*. In fact, there is no evidence in the record that Defendant maintained an effective harassment policy. To the contrary, Plaintiffs aver that "Wilkins Tipton did not have a sexual harassment policy in place at the time McLemore began his sexual harassment of the plaintiffs…" *See* (Nesbitt Aff. at ¶ 4, Stanley Aff. at ¶ 4 and Adair Aff. at ¶4). Defendant does not rebut these allegations. Defendant is not entitled to the *Faragher/Ellerth* defense. *See Faragher,* 524 U.S. at 807-808; *Ellerth*, 524 U.S. at 765.

Viewing the evidence in the light most favorable to Plaintiffs, the Court finds that they have raised a genuine issue of material fact as to whether they were subject to a hostile work environment at the hands of Defendants. Accordingly, Defendant's motion for summary judgment on Plaintiffs' hostile work environment claim as it relates to sexual harassment is denied.

**B. Retaliation Claim**

In the absence of direct evidence, retaliation claims are reviewed under the *McDonnell Douglas Corp. v. Green*, 411 U.S. 792 (1973) framework. *Abbott v. Crown Motor Co.*, 348 F.3d 537, 542 (6th Cir. 2003). "To make a *prima facie* showing of retaliation, a plaintiff must show

that (1) she engaged in protected activity, (2) the activity was known to the defendant, (3) the plaintiff was subjected to a materially adverse action, and (4) there was a causal connection between the protected activity and the adverse action. *Id.* "The burden of establishing a *prima facie* case in a retaliation action is not onerous, but one easily met." *Harris v. Metro.Govt. of Nashville*, 594 F.3d 476, 485 (6th Cir. 2010).

Once a plaintiff establishes a *prima facie* case, the burden shifts to the defendant to show a legitimate non-discriminatory reason for its action. *Abbott v. Crown Motor Co., Inc.*, 348 F.3d 537, 542 (6th Cir. 2003). "If the defendant meets this burden, the plaintiff must then demonstrate by a preponderance of the evidence that the proffered reason was a mere pretext for discrimination by establishing that the proffered reason: 1) has no basis in fact; 2) did not actually motivate the adverse action; or 3) was insufficient to motivate the adverse action." *Id*.

Plaintiffs' sole argument is that they suffered retaliation, through the installation of surveillance cameras, after complaining about the harassment by McLemore. They contend that in late April 2011, after Plaintiffs complained about harassment, twelve cameras were installed by Defendant. (Docket Entry No. 55 at 28). The cameras for the most part were aimed directly at Plaintiffs and their workstations. (*Id.*). It is Plaintiffs' position that this was "an act of retaliation and nothing more." (*Id.*).

Defendant, in turn, argues that Plaintiffs have identified no evidence that would support "their subjective feelings that the video cameras at issue were installed as an act of retaliation." (Docket Entry No. 49 at 10).

In this case, Plaintiffs' retaliation claim fails at the *prima facie* stage even though, just as in discrimination cases, "[t]he burden of establishing a *prima facie* case in a retaliation action is not onerous, but one easily met." *Nguyen v. City of Cleveland*, 229 F.3d 559, 563 (6th Cir.

2000). Plaintiffs may believe they were retaliated against, but that is not enough to carry their burden of production because "[a] plaintiff's conclusory allegations and subjective beliefs are not a sufficient basis to deny summary judgment." *Johnson v. Interstate Brands Corp.*, 351 Fed. Appx. 36, 42 (6th Cir. 2009).

Even assuming that Plaintiffs have satisfactorily shown they engaged in protected activity, there is still no evidence in the record suggesting that there was a causal connection between any protected activity and an adverse employment action. Therefore, summary judgment will be granted on Plaintiffs' retaliation claim.

## C. Intentional Infliction of Emotional Distress Claim

Lastly, Plaintiffs bring a claim of intentional infliction of emotional distress under Tennessee common law. Plaintiffs aver that Defendant, by and through McLemore, is liable for outrageous conduct. (Docket Entry No. 7 at 11). The "distress of [Plaintiffs'] work environment was [] so severe that no reasonable person could be expected to endure it." (*Id.*).

Under Tennessee law, in order to establish a claim of intentional infliction of emotional distress, Plaintiff must prove that: (1) the conduct complained of must be intentional or reckless; (2) the conduct must be so outrageous that it is not tolerated by civilized society; and (3) the conduct must result in serious mental injury. *Bain v. Wells*, 936 S.W. 2d 618, 622 (Tenn. 1997). Liability for intentional infliction of emotional distress is only appropriate where "the conduct has been so outrageous in character and so extreme in degree, as to go beyond all possible bounds of decency, and to be regarded as atrocious, and utterly intolerable in a civilized community." *Bryan v. Campbell*, 720 S.W. 2d 62, 64 (Tenn. Ct. App. 1986).

Tennessee permits the recovery of damages for emotional injuries standing alone that result from another's extreme or outrageous conduct. *Wilson, et al. v. Ours, et al.*, 2008 WL

17

4211117 at *6 (Tenn. Ct. App. 2008); *Moorhead v. J.C. Penney Co., Inc.,* 555 S.W.2d 713 (Tenn. 1977) (permitting recovery of damages for mental distress without accompanying physical injury where the mental anguish was due to the "extreme and outrageous" conduct of the defendant).

Outrageous conduct does not include "mere insults, indignities, threats, annoyances, petty oppression or other trivialities." *Lane v. Becker et al.*, 334 S.W.3d 756, 763 (Tenn. Ct. App. 2010); *Levy v. Franks,* 159 S.W.3d 66, 83 (Tenn. Ct. App. 2004); *Arnett v. Domino's Pizza I, LLC,* 124 S.W.3d 529, 539 (Tenn. Ct. App. 2003) (quoting *Bain,* 936 S.W.2d at 622). A plaintiff seeking damages for intentional infliction of emotional distress must meet an "exacting standard." *Lane*, 334 S.W.3d 756, 763 (citing *Miller v. Willbanks,* 8 S.W.3d 607, 614 (Tenn. 1999)). "Recovery for intentional infliction of emotional distress is limited to mental injury, which is so severe that no reasonable person would be expected to endure it." *Id.* (citing *Arnett,* 124 S.W.3d at 540).

In direct response to the harassing conduct, Plaintiffs contend they endured, among other things, the following:

*Nesbitt*

- Nesbitt suffered "extreme stress," which was communicated to her OB-GYN, although no treatment via medication was sought due to her pregnancy;

- She still suffers from distress and anxiety over remembering "the situation and reliving it through [the] lawsuit; and

- She has cried over having to "re-live the stressful situation through [the] lawsuit… on several occasions."

(Nesbitt Aff. at ¶¶ 6-8).

Plaintiff Nesbitt did not seek any counseling or medical assistance of any kind because of her alleged emotional distress she attributes to Defendant. (Nesbitt Dep. at p. 149). She claims,

18

rather, that she would not have sought medical help for her resulting stress because she was pregnant. (*Id.*).

*Stanley*

- The problems with McLemore carried over into Stanley's home life. She was not functioning effectively as a mother. She was always yelling at her sons for "stupid things";

- Stanley was not able to function effectively as a friend. She used to be social and go out with friends, but ever since "this happened," she cannot bring herself to leave her house;

- There "wasn't a day that went by that Mr. McLemore was present at work" that she was not distressed and taking 3 Xanax per day; and

- She would have nightmares from time to time after the cameras were installed – and wake up "drenched in sweat," paranoid, and could not get back to sleep. The dreams were of being watched by the cameras. These were "very restless nights" and she would come to work exhausted.

(Stanley Aff. at ¶¶ 6-7, 11).

Plaintiff Stanley testified that she never went to a psychiatrist and that she does not need one. (Stanley Dep. at p. 170).

*Adair*

- Prior to McLemore leaving, "it was more difficult for [Adair] to work..." While he was there, she would just "zone out." She had never had "a problem before";

- When Adair goes by McLemore's office, "it's a reminder, and it's terrible… it just sucks…"; and

- She gets upset and tearful whenever she has to talk about her work situation, but she rarely does.

(Walker Report – Adair at p. 2).

Adair's husband, Shayne Adair, testified that she is "much better" now and that he does not know if she takes any medication for anxiety or difficulty sleeping.

19

While Plaintiffs appear to have experienced some level of emotional anguish, Plaintiffs' aforesaid illustrations are simply insufficient to demonstrate the third element of intentional infliction of emotional distress – serious mental injury. *See Bain*, 936 S.W. 2d at 622; *see also Vanover v. White*, 2008 WL 2713711, *18 (E.D. Tenn. July 10, 2008)(serious mental injury is evinced by an inability to "cope" with the mental stress caused by the relevant events). As such, it is not necessary to consider whether the conduct alleged here "has been so outrageous in character and so extreme in degree, as to go beyond all possible bounds of decency." *See Bryan*, 720 S.W.2d at 64.

Therefore, Defendant is entitled to summary judgment on Plaintiffs' intentional infliction of emotional distress claim.

## IV. CONCLUSION

For all of the reasons stated, Defendant's Motion for Summary Judgment (Docket Entry No. 47) is hereby GRANTED as to Plaintiffs' hostile work environment based on racial harassment, retaliation and intentional infliction of emotion distress claims but DENIED with respect to the hostile work environment claim based on sexual harassment.

An appropriate Order shall be entered.

_Kevin H. Sharp_
KEVIN H. SHARP
UNITED STATES DISTRICT JUDGE